Application of George G. SHIYA, Petitioner-Appellee,

v.

The NATIONAL COMMITTEE OF GIBRAN, also known as the Comite National de Gibran, Representing the Town of Becharre, Lebanon, Respondent-Appellant.

Mary K. GIBRAN and William Saxe, as administrators c.t.a. of the Estate of Kahlil Gibran, and Mary K. Gibran, Plaintiffs,

v.

ALFRED A. KNOPF, INCORPORATED, Defendant,

v.

The NATIONAL COMMITTEE OF GIBRAN, also known as the Comite National de Gibran, Representing the Town of Becharre, Lebanon, Interpleaded Defendant.

Nos. 420, 421, Dockets 31072, 31073.

United States Court of Appeals Second Circuit.

Argued May 11, 1967.

Decided July 10, 1967.

J. JOSEPH SMITH, Circuit Judge:

The National Committee of Gibran appeals from a judgment of the United States District Court for the Southern District of New York, Sylvester J. Ryan, Chief Judge, which upheld attorney George G. Shiya's construction and interpretation of a contingent fee retainer entered into by the parties on November 1, 1956. The question to be resolved is whether Shiya is entitled to 25% of all the royalties from the renewal copyrights on seven works of the author Kahlil Gibran or to 25% of those royalties which had accrued at the termination of his services. We affirm Judge Ryan's decision that Shiya's retainer entitles him to 25% of all the renewal royalties.

Kahlil Gibran died in the United States in 1931. Under his will the royalties on the works in question were bequeathed to the town of his birth, Becharre, Lebanon. The appellant Committee, whose members are elected by the residents of Becharre, was formed to receive and distribute the royalties. When the original copyrights began to expire in 1946, Mary K. Gibran, the author's sister, filed renewal applications both personally and as administratrix of the Gibran estate. The Committee subsequently retained Shiya, who, after considerable litigation, secured the renewal rights for the Committee. See, Gibran v. Alfred Á. Knopf, Inc., 153 F.Supp. 854 (S.D.N.Y.1957), aff'd 255 F.2d 121 (2d Cir.), cert. denied 358 U.S. 828, 79 S.Ct. 47, 3 L.Ed.2d 67 (1958). Subsequent proceedings in the Surrogate Court were concluded in 1960.

The negotiations which preceded the November 1, 1956 retainer occurred over more than four years and are evidenced by many documents and some oral tes-

timony, none of which is challenged. In January 1953, in order to obtain payment of the renewal royalties, Mary Gibran filed suit in the Southern District against Alfred A. Knopf, Inc., the publisher of the works. Knopf interpleaded the Committee. Thereupon, the Lebanese Consul General in New York informed the Committee that it would need to appoint an attorney. Joseph Rahme, the president of the Committee, directed inquiries concerning the renewal rights to Dr. Naef K. Basile, a Lebanese-American from Becharre who practiced medicine in New York. Basile replied in April 1953 that "whoever will have the final award, will receive the money and all what shall come out as income from the books in the future" and that unless the Committee retained a vigorous attorney, "the money and whatever will follow then will no doubt go to Mariana." In June 1953, Rahme granted a general power of attorney to Basile with the understanding that Basile would retain a lawyer.

In the following months, Basile consulted ten to twelve law firms, including Shiya's. Shiya proposed a 35% retainer if he paid expenses and a 25% retainer if the Committee paid expenses. While in Lebanon during July and August 1953, Basile discussed the hiring of a lawyer with Rahme who asserted that Shiya's proposal was too high and instructed Basile to interview additional lawyers. Upon his return to the United States, Basile contacted seven or eight more firms. Unable to locate a competent lawyer who would better Shiya's terms, Basile, on December 3, 1953, retained Shiya

> "to prosecute and adjust for me and for the said National Committee of Gibran, our claim for the funds deposited in Court by Alfred A. Knopf, Incorporated, in connection with the litigation now pending in the United States District Court, Southern District of New York, entitled:
>
>> Mary K. Gibran and William Saxe, as administrators c.t.a. of the Estate of Kahlil Gibran, and Mary K. Gi-

> bran, Plaintiffs, against Alfred A. Knopf, Incorporated, Defendant, against The National Committee of Gibran, et al., interpleaded Defendants.

> and I do hereby give you as my said attorney the exclusive right to take all legal steps to enforce my said claim and I hereby further agree not to settle this claim in any manner without your consent as attorney.

> In consideration of the services rendered and to be rendered by you as my attorney, I hereby agree to pay you, and you are authorized to retain out of any moneys that may come into your hands, thirty-five (35%) per cent of all sums recovered by settlement, suit or otherwise for or on behalf of The National Committee of Gibran in the above described action, proceeding or litigation."

Shiya then commenced to render legal services for the Committee. During September and October 1954, Basile reported to Rahme on the progress of the litigation, commended the services that Shiya was rendering and stated that it was fortunate that Shiya had agreed to an exclusively contingent retainer. On January 15, 1955, in response to a query by Rahme about Shiya's fee, Basile stated:

> "When I was in Lebanon in the summer of 1953, we conferred together with respect to the fee of Mr. Shiya. I stated to you very clearly that the attorney had requested in the second matter that he receive twenty-five percent of all sums involved or connected with the litigation if you agreed to pay all expenses incidental thereto, or thirty-five percent if he pays all expenses. At that time I heard no objections from you whatsoever. Accordingly, on my return to New York I entered into an agreement with Mr. Shiya covering his fee based upon the terms presented to you."

Six months passed and on July 20, 1955, Rahme informed Basile that Lebanese law restricted retainers to 20%

and that the members of the Committee would be surcharged for any excess they paid. Consequently, "in view of the fact that you have written to us to the effect that the lawyer has required thirty [sic] percent for his compensation of the monies that shall * * * be adjudged to inure to the benefit of the committee," Rahme requested Basile to persuade Shiya to accept a fee of 20%. Three months later, on October 29, Basile replied:

"When I was in Lebanon and met with you and the committee, I presented to you in great detail and clarity what the attorney requested for his fee if he were to pay all expenses incident to the litigation or what his fee would be if you were to pay these expenses. Since there was agreement on your part as to his fee if he paid all expenses and you voiced no objection, I entered into a written retainer agreement with him. This prevailed until the receipt of your last letter and the letter of the committee addressed to Consul Shebea. Both contained comment that the fee fixed by attorney George Shiya is very high and not consistent with Lebanese practice."

Nevertheless, Basile continued, Shiya, "with great reluctance finally assented" to Shebea's suggestion of "a fee equal to twenty-five percent of the total recovery." Basile concluded as follows:

"Because of the fact that the trial of the case will soon be reached, I found it advisable to write to you for an acknowledgment of Consul Shebea's letter. If you approve of what Consul Shebea and I have suggested and offered to Mr. Shiya, I shall renew my retainer agreement with him and the litigation will proceed in its regular course."

On November 21, 1955 the Committee accepted Basile's "suggestion that Mr. Shiya receive 25% as he requested for fees and the committee considers the 5% added to the 20% to be for expenses and dues incurred by the case." Two days

later, Rahme authorized Basile "to enter into an agreement with Mr. Shiya fixing his compensation * * * at twenty-five percent of the recovery, with the remaining seventy-five percent thereof payable to the committee, free and clear of all expenses of the litigation * * *." On the other hand, the Committee's Decision 88, dated November 20, 1955, which was not communicated to either Basile or Shiya, stated:

The Secretary was instructed to write Dr. Basile on this decision and to affirm that the 25% is the fee only for the amount of money accumulated at the date of the final ruling on the case.

Almost a year had passed when, on September 8, 1956, Basile wrote Rahme that:

"I was told by the court this week to present a photo copy of the agreement attached here for your signature and authentication by the American Consul. The agreement states exactly what you have accepted in writing. The lawyer will be paid 25% at the termination of the case and the Committee of Gibran will get 75%. The 25% will include all his fees if the case remains in New York.

\* \* \* \* \* \*

"Note: Twenty-five percent—till a final judgment is rendered from beginning and through appeal. He is responsible for all expenses of the case. Not clear. He is asking twenty-five percent at the beginning and twenty-five percent through appeal. It will be more correct to have a new agreement drafted by a lawyer who knows English."

The agreement attached provided as follows:

"[Y]ou are entitled to receive as compensation for such services twenty-five per cent (25%) of all moneys determined by the Court to be due to The National Committee of Gibran, also known as the Comite National de Gibran, and the said Court or any judge thereof is hereby authorized to

provide in any appropriate judgment, decree or order in the said action that twenty-five per cent (25%) of all moneys on deposit in the Registry of said Court to the credit of the said action be paid directly to you, George G. Shiya, and that the remaining seventy-five per cent (75%) thereof be paid to The National Committee of Gibran, also known as Comite National de Gibran.

In view of the possibility of an appeal by one or the other of the parties to said action from the determination of the said District Court, it is our further understanding and it is agreed that you shall be entitled to receive as compensation for your services twenty-five per cent (25%) of all moneys due The National Committee of Gibran, also known as the Comite National de Gibran, at the time of the final determination of such appeal or appeals whether said moneys are on deposit in the Registry of the said Court or in the hands of Alfred A. Knopf, Incorporated, and the said Knopf is hereby authorized and directed to make such payment to you and to remit the remaining seventy-five per cent (75%) thereof to The National Committee of Gibran, also known as the Comite National de Gibran."

The Committee retorted on October 11, 1956 that the provisions of the attached agreement

"fully contradict the agreement which has been reached between the Committee and the attorney, Mr. Shiya. It was agreed between them that the committee pay him 25% of the frozen money in New York upon termination of the case there, or in any other city, till the final stages. The committee does not pay Mr. Shiya's fees or expenses if the case is not won.

Please inform the Committee regarding this subject and provide us with another agreement, according to our request to be signed by the proper authorities."

On November 1, 1956, the following retainer resulted:

"This letter will serve to confirm the agreement between us supplementing the written retainer forwarded to you in September for your signature before the American Consul in Beirut.

It is understood and agreed between us that the payment to me of the sum of 25% of the monies due and owing from Knopf to the Comite National De Gibran, will be made after the termination of the litigation in the U. S. District Court and any other court to which the case may be taken on appeal. Such payment is to be made to me only in the event that the final judgment in this case is rendered in favor of Comite National De Gibran.

It is also understood and agreed that the above compensation of 25% of monies due and owing from Knopf to Comite National De Gibran will include payment for services rendered by me in this matter, in addition to all expenses and disbursements incurred by my office in connection with the litigation of this matter and that I shall make no claim for such expenses and disbursements or compensation for services herein, in the event that final judgment herein is rendered against Comite National De Gibran. * * *"

On June 24, 1957 the Committee wrote Basile to the effect that:

"The copy of the retainer agreement sent to the Committee does not agree with the substance of its basic agreement and that is 25% of the moneys withheld or blocked upon the date of the inception of the trial and not the moneys that are due or that shall become due as appears in your retainer agreement."

█ Both parties agree that the crucial document is the November 1, 1956 retainer. Judge Ryan concluded that this contract was not ambiguous and that it entitled Shiya to receive 25% of all the renewal royalties. Because this conclusion was based solely on the construction of a written document, it is freely reviewable by us on appeal. United Nations Korean Reconstruction Agency v.

Glass Production Methods, Inc., 291 F.2d 168, 172 (2d Cir. 1961). Cf. Meyers v. Selznick Co., 373 F.2d 218, 222 n. 2 (2d Cir. 1966).

█ We disagree with Judge Ryan's holding that the November 1, 1956 retainer is not ambiguous. The pivotal phrase is *"the payment to me* of the sum of 25% of the monies due and owing from Knopf to the Comite National De Gibran, *will be made after the termination of the litigation * * *."* (Emphasis supplied.) In providing that 25% of the fund would be paid to Shiya at the termination of the litigation, the language is not ambiguous. The ambiguity lies instead in the fact that the phrase refers only to the time of payment, not to the time at which Shiya's rights are to be measured. While it is apparent that Shiya is entitled to 25% of all royalties accumulated at the termination of the litigation, it is not clear whether he is also owed 25% of future royalties.

Because the retainer is ambiguous, evidence of the circumstances surrounding its making is admissible.[1] See, e. g., H. K. Porter Co. v. Wire Rope Corp. of America, Inc., 367 F.2d 653, 660–661 (8th Cir.1966); Boro Hall Corp. v. General Motors Corp., 164 F.2d 770 (2d Cir. 1947); Oil Trading Associates v. Texas City Refining, Inc., 201 F.Supp. 846, 849 (S.D.N.Y.1962); West Africa Nav., Ltd. v. Ore & Ferro Corp., 192 F.Supp. 651 (S.D.N.Y.1960). The Committee does not challenge Basile's authority to retain Shiya; accordingly, the task on appeal is to examine the "surrounding circumstances" and determine the intention of the parties. Taking into account the "surrounding circumstances," however, we agree with Judge Ryan's conclusion as to what the contract covered.

Thus, while we do not agree that the November 1, 1956 retainer was totally lacking in ambiguity, we are convinced that Judge Ryan's interpretation of its essential meaning is correct. The prize sought in the litigation, for the conduct of which Shiya was hired on a fee which was to abide the outcome, was the full fruits of the renewal copyrights. References to the fund in court and Knopf's disposition of it are to but one stage of the renewal period. The Committee had second thoughts about the fairness of the basic agreement when the subject matter of the litigation proved far more valuable than had earlier appeared. And it is able to point to language which appears to limit the fee to a percentage of the funds in court at one or another stage, i. e., the 1955 correspondence contains various references to the sum from which the retainer is to be drawn. The January 15, 1955 letter from Basile to Rahme referred to "all sums involved or connected with the litigation"; the July 20, 1955 letter from Rahme to Basile stated that Shiya had "required thirty percent for his compensation of the monies that shall be adjudged to inure to the benefit of the Committee"; the October 29, 1955 letter from Basile to Rahme reported that Shiya had assented to "a fee equal to twenty-five percent of the total recovery"; on November 23, 1955 Rahme authorized Basile to retain Shiya "at twenty-five percent of the recovery." All of these references are ambiguous; they can be read to refer either to the frozen royalties or to all the royalties. Although the parties were aware that all royalties were involved, it is argued that they limited Shiya's retainer to the frozen royalties; and therefore that the 1955 correspondence must be deemed to refer to the frozen fund. The use of the terms "all" and "total" may have been used to distinguish the moneys frozen at the termination of Shiya's services from the moneys frozen at the inception

---

1. It has been repeatedly argued that courts should forthrightly abandon the prerequisite of finding ambiguity before admitting evidence of "surrounding circumstances." United States v. Lennox Metal Mfg. Co., 225 F.2d 302, 309–315 (2d Cir. 1955) (Frank, J., concurring);

3 Corbin, Contracts §§ 542, 542A, 543 (1960), §§ 543A, 543AA, 543C (Pocket Part 1964); 9 Wigmore, Evidence § 2470 (1940); McCormick, Evidence § 219 (1954). Because we have here a case of clearcut ambiguity, there is no occasion to pass on those arguments.

of his services (which, incidentally, is what Rahme's July 24, 1957 letter claimed the retainer to cover).

The September-October 1956 exchange, which led to the November 1, 1956 retainer, is also some support for the argument that the parties intended to limit Shiya's fee to a percentage of the funds frozen. Basile's September 8 letter states that Shiya "will be paid 25% at the termination of the case" which "will include *all* his fees if the case remains in New York." [Emphasis supplied.] "Twenty-five percent * * * till a final judgment is rendered from beginning and through appeal. He is asking twenty-five percent at the beginning and twenty-five percent *through* appeal." [Emphasis supplied.] This claim of Basile's understanding of the agreement is supported by the language of the attached retainer drafted by Shiya. The first paragraph provided that Shiya was entitled to twenty-five percent "of all moneys determined by the Court to be due" and that the court was authorized to pay twenty-five percent "of all monies on deposit" to Shiya. The second paragraph entitled Shiya to twenty-five percent "of all monies *due*" the Committee "*at the time of the final determination*" of an appeal. [Emphasis supplied.] The Committee's reply supports this reading by stating that it was agreed "that the committee pay him 25% of the *frozen money* in New York upon termination of the case there, or in any other city, till the final stages." [Emphasis supplied.]

■ However, these arguments seem to us outweighed by the factors favoring the interpretation arrived at by Judge Ryan of the parties' meaning and intent at the time of the November 1, 1956 retainer.

It must be stressed initially that from the outset both Basile and Shiya were fully aware that the subject of the litigation was all the renewal royalties, not simply those "frozen" at the termination of Shiya's services. Keeping Basile's and Shiya's awareness about the subject of the suit in mind, the ambiguity contained

in the December 3, 1953 retainer between the phrase "the funds deposted in Court" (which favors the Committee), and the language "thirty-five (35%) per cent of all sums recovered by settlement, suit or otherwise" (which favors Shiya), may well be resolved in favor of Shiya. Furthermore, by using "claim" to refer to the fund, and "litigation" to refer to the overall subject matter, the parties clearly manifested their intent that Shiya was retained to recover the fund but would receive 35% of all renewal royalties. Accordingly, the original retainer seems to have provided that Shiya would receive 35% of all the royalties.

Once the terms of the original agreement are established, the ambiguities in the 1955 correspondence resolve themselves in favor of Shiya. As set out above, the January 15, 1955 letter from Basile to Rahme referred to "all sums involved or connected with the litigation"; the July 20, 1955 letter from Rahme to Basile stated that Shiya had "requested thirty percent for his compensation of the monies that shall be adjudged to inure to the benefit of the committee"; the October 29, 1955 letter from Basile to Rahme reported that Shiya had assented to "a fee equal to twenty-five percent of the total recovery"; on November 23, 1955 Rahme authorized Basile to retain Shiya "at twenty-five percent of the recovery." Thus, the parties repeated the understanding that Shiya would receive 25% of all renewal royalties.

The September-October 1956 exchange, which preceded the November 1, 1956 retainer, is further indication of the parties' intent. The first paragraph of the retainer drafted by Shiya which was contained in Basile's letter of September 8 provided that Shiya was entitled to twenty-five percent "of all moneys determined by the Court to be due" and that the Court was authorized to pay twenty-five percent "of all moneys on deposit" to Shiya. Any ambiguity in this paragraph and in the following one which entitled Shiya to twenty-five percent "of all moneys due" the Committee

"at the time of final determination" of any appeal can well be resolved in favor of Shiya. The Committee's reply of October 11, 1956, while referring to the "frozen money," is concerned more with the provisions that the retainer is contingent and that Shiya will pay expenses. The final retainer of November 1, 1956 only describes the time of payment and clarifies the concern about contingency and expenses. Judge Ryan had the advantage of observation of the actual negotiators of the agreement, Basile and Shiya on the stand, and credited their testimony. In this he was justified. Furthermore, the form of retainer urged by the Committee would be unusual; it might encourage attorneys to employ dilatory techniques to prolong the proceedings and thereby augment their fees.

While the fee of Shiya is likely to be large in amount, it is so only because the subject of the litigation, title to which he succeeded in confirming for the Committee, turned out to be of substantial value. Had the Court held that there was no meeting of the minds on amount, an award of 25% of the value of the recovery in *quantum meruit* would not be extravagant.

Judgment affirmed.

HAYS, Circuit Judge (dissenting):

It seems to me that the minimum which should be required of a lawyer in relation to his client is that he make clear how much his fee is going to be. The majority concedes that Shiya left the terms of his retainer ambiguous. While I would consider this to be enough to justify denying Shiya the recovery he seeks, I believe that the Committee's interpretation of their agreement is in fact the correct interpretation.

The principal question is the meaning of the phrase "25% of the monies due and owing from Knopf to the Comite" in Shiya's letter of November 1, 1956. The letter prepared by Shiya for Rahme's signature indicates that Shiya's 25% interest was intended to apply only to royalties accrued to the date of termination of the action, including any appeal.

Basile's postscript to his September 8th letter ("He is asking twenty-five percent at the beginning and twenty-five percent through appeal") and Rahme's letter of October 11th ("It was agreed between them that the committee pay him 25% of the frozen money in New York upon termination of the case * * *."), support this view as does Shiya's failure to assert any claim to renewal royalties paid to the Committee after termination of the Surrogate Court proceedings.

If any ambiguity remains as to the meaning of the phrase "due and owing" in the November 1st letter, it ought to be construed against Shiya who could easily have avoided any difficulty by providing clearly for a 25% interest in the future royalties.